UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

BRYAN A. LAMEY,                                          No. 14-13729 ta7

     Debtor.

LOS ALAMOS NATIONAL BANK,

     Plaintiff,

v.                                                       Adv. No. 15-1029

BRYAN A. LAMEY and
ANN LAMEY,

     Defendants.

## OPINION

     The Court held a trial on the merits of Plaintiff's nondischargeability and denial of discharge complaint. Having weighed the evidence and considered the relevant legal standards, the Court rules that Defendant's discharge should be denied under §§ 727(a)(2)(B) and (a)(4).

I.     <u>FACTS</u>

     The Court finds the following facts:[1]

     1.    <u>General</u>. Defendant Bryan Lamey is a certified public accountant. He worked for Arthur Andersen from 1992-1995 and then started his own accounting firm (Chavarria, Dunne and Lamey), which specialized in litigation support. Before March, 2010, the owners of Chavarria, Dunne and Lamey sold the firm to a regional accounting firm (Clifton Gunderson), receiving

---

[1] The Court took judicial notice of the docket in the adversary case and in the main bankruptcy case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

millions of dollars in exchange. As of March 4, 2010, Defendant's balance sheet reflected a net worth of more than $21 Million. His March 30, 2012, balance sheet showed a net worth of $15,440,000. Defendant is a relatively sophisticated businessman.

On December 30, 2014, Debtor filed this chapter 7 case. On his original bankruptcy schedules, Defendant reflected a negative net worth of $1,463,563, meaning that he had lost nearly $17 Million in less than three years. Defendant lost portions of his wealth day trading.

2.    The United Entities. Defendant formed six limited liability companies in 2012 (the "United Entities") for the purpose of owning and operating recreational vehicle dealerships in Las Cruces and Albuquerque, New Mexico.[2] The other owners were Robert Maese, Sr. and Robert Maese, Jr. Defendant owned 51% of the holding companies and was the managing member of all the United Entities.

Three of the United Entities[3] borrowed $1,650,000 from Plaintiff to buy real estate in Las Cruces for the Las Cruces dealership. The loan was secured by a mortgage on the purchased land and by a security interest in personal property, including inventory and equipment.

The RV dealerships were unprofitable; the owners closed them in 2013. Their "floorplan" lender (GE Capital) repossessed its collateral of new and used recreational vehicles. The Albuquerque real estate was sold in August, 2013. The Las Cruces dealership sold its non-floor-planned inventory, its parts inventory, and the other dealership personal property in late 2013 or

---

[2] The United Entities consisted of two holding companies (United Real Estate Holdings LLC and United RV Holdings LLC); two real estate companies (United Real Estate Las Cruces LLC and United Real Estate Albuquerque LLC); and two operating companies (United RV Las Cruces LLC and United RV Albuquerque LLC). The real estate holding company owned the real estate companies, and the operating holding company owned the operating companies.

[3] The two holding companies and the Las Cruces real estate company.

early 2014, netting about $20,000-$30,000. It is not clear which United Entity owned this property.[4]

Tax returns for the United Entities were prepared timely for the 2012 tax year. Tax returns for the 2013 tax year were not completed until April 6, 2015. The United Entities' accountant was Donald Miller of Peltier, Gustafson & Miller.

3.    Rhonda Smith.  On May 29, 2014, Defendant's sister Rhonda Smith gave a $14,000 check to Defendant, which he deposited in one of his bank accounts. Defendant repaid his sister, with interest, on July 27, 2014. The payment amount was $14,268. Defendant did not list the $14,268 payment on his Statement of Financial Affairs ("SOFAs") (question 3(c) requires disclosure of all insider payments made within a year pre-petition). Defendant has never amended his SOFAs. In response to a written request for production of documents evidencing transfers to brothers or sisters between September 1, 2012 and October 31, 2016, Defendant stated that there were no such transfers or responsive documents.[5]

4.    2013 Tax Refund.  On October 14, 2014, Defendant filed his 2013 federal income tax return, asserting that he was due a $8,538 refund. Defendant did not disclose the refund on his bankruptcy schedule B. Defendant received the refund on May 26, 2015, but did not tell the trustee. Nearly two years later, Defendant amended his schedule B to disclose the existence and payment of the 2013 tax refund. The disclosure misleadingly attributes the 2013 tax refund to net operating losses generated by the United Entities (see the discussion below).

5.    Dana Lamey's Schwab Account.  Defendant's ex-wife, Dana Lamey, has a Schwab cash management account. In August, 2013, Ms. Lamey signed a power of attorney giving

---

[4] The likely owner was United RV Las Cruces LLC, the operating company for the Las Cruces dealership.
[5] The request for production and responses were in another adversary proceeding, brought by the Maeses, which also seeks, inter alia, denial of Defendant's discharge.

Defendant the right to transfer or withdraw funds from the account. In 2014, Defendant transferred the following amounts to himself from the Schwab account: $7,500 on January 16, 2014; $3,000 on February 11, 2014; $6,000 on March 12, 2014 (two transfers); $1,100 on May 5, 2014; and $22,500 on July 1, 2014 (two transfers). Defendant used the account as if it were his own.

Defendant did not disclose any information about Dana Lamey's Schwab account, including the fact that on the petition date the account balance was $1,268. During his deposition taken by Plaintiff's counsel, Defendant testified that the transfers in 2014 were done by Dana Lamey, not by him. That testimony was false.

Ms. Lamey testified that the Schwab account was hers, but the funds in the account were both hers and Defendant's. Defendant testified he used the account to make money for both families.

Defendant signed answers to Plaintiff's interrogatories on December 16, 2015, under penalty of perjury. In response to Plaintiff's request to list all bank account to which he had signing authority, Defendant did not list Dana Lamey's Schwab account.

6.    United Entities' NOLs and Defendant's Amended Tax Returns. On December 29, 2014, the IRS notified Defendant that it was auditing his 2011 federal income tax return. Defendant hired CPA Don Miller to represent him in the audit.

Defendant and Miller realized that the United Entities had generated substantial net operating losses ("NOLs") in 2013. Because the United Entities' profits and losses passed through to its members, the NOLs would benefit Defendant and the Maeses. Further, the NOLs could be carried back to 2010. On or about April 6, 2015, Miller filed the 2013 federal and state income tax returns for United Entity holding companies, and also issued K-1s to the members.

Based on the K-1s, Defendant filed amended state and federal tax returns for 2010, 2011,

and 2013, which generated the following refunds:

| Return | Refund amount | Date paid |
|---|---|---|
| 2010 Federal | $50,464 | 2/22/16 |
| 2011 Federal | $54,974 | 10/12/16 |
| 2013 Federal | $5,019[6] | 10/02/15 |
| 2013 New Mexico | $3,324 | Unknown day or month, 2015 |
| 2014 Federal | $14,028 | 4/22/15 |
| 2014 Oklahoma | $3,098 | 4/20/15 |
| Total | $130,090 | |

All of the refunds were paid to Defendant and deposited in his bank accounts. He did not notify the trustee of the payments, nor turn the money over to the trustee. He apparently spent the tax refunds. Defendant's original bankruptcy schedules do not reflect any potential tax refunds.[7] Defendant amended his schedule B on February 13, 2015, but did not disclose any potential tax refunds. Defendant did not file a further amendment to Schedule B until March 14, 2017, at which time he disclosed three of the tax refunds, totaling $69,511. LANB exposed at least some of these omissions during a deposition taken before the March 14, 2017 amendments. Defendant's schedules as amended never accurately described the tax refunds he received. By April 6, 2015, he knew the extent of the NOLs, and that he would use them to amend his prior tax returns and obtain large refunds.

7.      Mustang GT.   On the petition date Defendant owned a 2007 Ford Mustang GT "Foose." He scheduled the car with a value of $10,225, and claimed all of that amount exempt. Defendant sold the car on March 30, 2015, for $14,500. He did not notify the trustee about the sale or turn over the excess above the claimed exemption. None of the schedule amendments disclosed the sale or the sales price. In particular, the March 14, 2017 amendment continued to value the car at $10,225. Defendant did not seek the Court's or the trustee's approval before selling the car.

---

[6] This is in addition to the refund paid on June 1, 2015.
[7] There is a disclosure that the two United operating companies have "NOLs and other potential tax-related benefits."

8. <u>Counterclaims</u>. Defendant asserted counterclaims against Plaintiff in this adversary proceeding. The counterclaims were not disclosed until March 14, 2017, even though Defendant had asserted similar claims on behalf of the United Entities on April 19, 2016, and the transaction at issue closed in August, 2012. Subject to Court approval, the trustee and the Plaintiff have agreed to settle the counterclaims for $15,000.

9. <u>Cash Value of Omitted or Removed Assets</u>.

The following table lists the omitted or removed assets discussed above and their value:

| Item | Value | Value kept by Defendant |
|------|-------|------------------------|
| Rhonda Smith Preference | $ 14,268 | |
| 2013 tax refund | $ 8,538 | $ 8,538 |
| Dana Lamey Schwab Account | $ 1,268 | |
| Tax Refunds from Amended Returns | $ 130,090 | $ 130,090 |
| Mustang GT | $ 10,825[8] | $ 10,825 |
| Counterclaims | $ 15,000 | |
| Total | <u>$179,989</u> | <u>$149,453</u> |

10. <u>Records</u>. Defendant had a substantial number personal banking and other financial records, but did not have all of the financial records Plaintiff wished to review. Plaintiff subpoenaed additional records from banks, brokerage companies, and the like, and spent time and money analyzing the records produced by Defendant and the third parties. Plaintiff was able to obtain a reasonably accurate accounting from the combination of records.

II. <u>DISCUSSION</u>

A. <u>§ 523(a)(6) (Willful and Malicious Injury to Property)</u>

Plaintiff's first claim is that a portion of its debt is nondischargeable because one of the United Entities sold Plaintiff's collateral without permission and did not turn over the proceeds.

---

[8] This amount is the $14,500 sales price less the exemption amount, which was amended on May 12, 2015, to reduce the exemption from $10,225 to $3,675.

Section 523(a)(6) provides that a debt "for willful and malicious injury by a debtor to another entity or the property of another entity" is nondischargeable. Selling collateral without the permission of the secured creditor may, under certain circumstances, qualify as willful or malicious injury. *See, e.g., In re Longley*, 235 B.R. 651, 658 (10th Cir. BAP 1999).

This claim fails because there is not enough evidence that Plaintiff had a security interest in the subject property. The security agreement Plaintiff relies upon was signed by the United holdings companies and the Las Cruces real estate company, but not by the likely owner of the alleged collateral, i.e., the Las Cruces operating company.

Further, information about the sale is very skimpy. The Court cannot tell what was sold, when it was sold, for how much, or how the money was spent. Overall, Plaintiff did not carry its burden of proof on this claim.

B.    General Standards for § 727 Denial of Discharge.

"Denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor. The provisions denying the discharge are construed liberally in favor of the debtor and strictly against the creditor." *In re Mosley,* 501 B.R. 736, 742 (Bankr. D.N.M. 2013) (citation omitted). "Completely denying a debtor his discharge ... is an extreme step and should not be taken lightly." *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir. 1993). However, the "fresh start" policy embodied in the Bankruptcy Code is limited to the "honest but unfortunate debtor." *Grogan v. Garner,* 498 U.S. 279, 286–87 (1991) (quotation omitted).

The standard of proof is a preponderance of the evidence. *In re Stewart*, 263 B.R. 608, 612 (10th Cir. BAP 2001). The plaintiff has the burden of proving each element of its claim. *Id.*

C.    § 727(a)(2)(B) (Concealment of Property of the Estate).

Section 727(a)(2)(B) allows Defendant a discharge unless he

with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the estate, after the date of the filing of the petition.

"To deny a debtor's discharge under § 727(a)(2)(B), the movant must establish by a preponderance of the evidence that the debtor transferred or concealed property of the estate after filing bankruptcy with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of the property." *In re Coppaken,* 2017 WL 2371119, at *19 (Bankr. D. Kan.), *quoting Hepner v. Kleinhans (In re Kleinhans)*, 2010 WL 1050583, at *3 (10th Cir. BAP); *In re Sowers*, 229 B.R. 151, 156 (Bankr. N.D. Ohio 1998) (same).[9]

Concealment means withholding knowledge of an asset by failing or refusing to divulge owed information. *In re Sowers,* 229 B.R. at 156; 6 Collier on Bankruptcy ¶ 727.02[6][b] (16th ed.) (using the same language). A transfer is a disposition of an interest in property, and is construed as broadly as possible. § 101(54); *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279 (9th Cir. 1996) (withdrawals from bank account constitute transfer under § 727(a)(2)(A)).

Omitting information in a debtor's bankruptcy schedules may also constitute post-petition concealment for purposes of § 727(a)(2)(B). *See In re Hadley,* 70 B.R. 51, 53 (Bankr. D. Kan. 1987) (debtors' failure to list assets on their bankruptcy schedules can be construed as concealment both before and after the filing of the bankruptcy petition), cited in *In re Sowers*, 229 B.R. at 157.

The fraudulent intent must be actual, not constructive. *In re Standiferd*, 2008 WL 5273690, at *8 (Bankr. D.N.M.); *In re Sowers,* 229 B.R. at 157, citing *Bank of Pennsylvania v. Adlman,* 541 F.2d 999, 1003 (2nd Cir. 1976). Actual intent may be established by circumstantial evidence or

---

[9] Another formulation is that plaintiff must prove the debtor transferred, removed, etc. estate property, post-petition, intending to hinder, delay or defraud a creditor or estate officer. *In re DiGesualdo*, 463 B.R. 503, 519 (Bankr. D. Colo. 2011); *In re Ritchie*, 543 B.R. 311, 319 (Bankr. D.N.M. 2015).

inferred from the debtor's conduct.  *In re Standiferd*, 2008 WL 5273690 at *8; *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989); *American General Finance, Inc. v. Burnside,* 209 B.R. 867, 871 (Bankr. N.D. Ohio 1997).  "Just one wrongful act may be sufficient to show actual intent under § 727(a)(2), [but] a continuing pattern of wrongful behavior is a stronger indication of actual intent."  *In re Sowers*, 229 B.R. at 157.

Defendant's conduct falls within § 727(a)(2)(B).  He should have told the trustee and/or amended his schedules as soon as he applied, post-petition, for the tax refunds generated by the NOLs.[10]  When he received the tax refunds, Defendant should have turned them over to the trustee.[11]  The same is true for the 2013 federal tax refund Defendant applied for pre-petition and received in May, 2015.  Defendant received post-petition and transferred (i.e. spent) or removed $130,000 in pre-petition tax refunds.

Similarly, when Defendant sold the Mustang GT, he should have told the trustee, amended his schedule B to reflect the actual value of the car, and turned over the $10,825 difference between the sales price and the claimed exemption.

Defendant's failure to disclose certain assets also constitutes post-petition concealment. These assets include his counterclaim against Plaintiff, the Rhonda Smith preference claim, Dana Lamey's Schwab account, and the 2013 federal tax refund.

---

[10] All tax refunds based on pre-petition income or loss are estate property, whenever paid.  *See Barowsky v. Serelson (In re Barowsky)*, 946 F.2d 1516 (10th Cir. 1991), citing *Kokoszka v. Belford*, 417 U.S. 642, 648 (1974); *Holder v. Wilson (In re Wilson)*, 49 B.R. 19, 20 (Bankr. N.D. Tex. 1985) (tax refund based on pre-petition losses was property of the estate), citing *Segal v. Rochelle*, 382 U.S. 375 (1966) (loss carry-back refund is property of the estate); *see also Official Committee of Unsecured Creditors v. PSS Steamship Company, Inc. (In re Prudential Lines, Inc.)*, 928 F.2d 565, 573 (2d Cir. 1991) (right to carry forward net operating losses ("NOLs") was property of the estate) *and Gibson v. United States (In re Russell)*, 927 F.2d 413, 417-19 (8th Cir. 1991) (same); *cf.* 26 U.S.C. § 1398(g) (estate succeeds to tax attributes of debtor, including net operating loss carryovers).  Here, all $130,090 in tax refunds were for pre-petition years and based on pre-petition losses.  These tax refunds are property of the estate.

[11] A debtor has an affirmative duty to turn over property of the estate, without first requiring a demand or turnover motion by the trustee.  *Rupp v. Auld (In re Auld)*, 561 B.R. 512, 518 (10th Cir. BAP 2017).

Taken together, Defendant's actions show a pattern of intentional, fraudulent removal, transfer, or concealment of estate property, which runs afoul of § 727(a)(2)(B).

D. § 727(a)(3) (Preservation of records).

Under § 727(a)(3), the court shall grant Defendant a discharge unless he

has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all circumstances.

"Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them." *The Cadle Co. v. Stewart* (*In re Stewart),* 263 B.R. 608, 615 (10th Cir. BAP 2001), *aff'd,* 35 Fed. App'x. 811 (10th Cir. 2002), quoting *Hedges v. Bushnell,* 106 F.2d 979, 982 (10th Cir. 1939). "Whether the records are sufficient lies within the Court's discretion." *In re Splawn,* 376 B.R. 747, 758 (Bankr. D.N.M. 2007).

A plaintiff has the burden of making a *prima facie* case that the debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain [her] financial condition and *material business* transactions." *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1295 (10th Cir. 1997) (emphasis in original). The debtor then has the burden to justify his failure to maintain records. *In re Stewart,* 263 B.R. at 615. "[C]reditors should not be required to speculate about the financial condition of the debtor or hunt for the debtor's financial information." *In re Guenther,* 333 B.R. 759, 765 (Bankr. N.D. Tex. 2005).

In general, a higher standard of recordkeeping will be required of debtors who are sophisticated business persons. *In re Potts*, 501 B.R. 711, 719 (Bankr. D. Colo. 2013); *In re Luby*, 438 B.R. 817, 832 (Bankr. E.D. Pa. 2010). The Court may consider the debtor's occupation,

financial structure, education, experience, and sophistication.  *Potts*, 501 B.R. at 719; *In re Strbac*, 235 B.R. 880, 882 (6th Cir. BAP 1999).

Here, the evidence is unclear about the extent of Defendant's records.  Plaintiff subpoenaed records from Charles Schwab, TD Ameritrade, Vision Bank, and First National Bank of Omaha, after Defendant failed to turn over the requested documents.  The subpoenaed records helped give Plaintiff a full picture of Defendant's financial condition and business transactions, and allowed Plaintiff to find assets that were not disclosed on Defendant's bankruptcy schedules.  It is not clear, however, that Defendant's records were inadequate for Plaintiff to "sufficiently identify the transactions that intelligent inquiry can be made respecting them."  *Stewart*, 263 B.R. at 615.  Plaintiff's trial evidence focused almost entirely on § 727(a)(2)(B) and (a)(4).  In its opening Plaintiff mentioned § 727(a)(3), but little questioning of any witness concerned (a)(3).  Weighing all of the evidence, the Court concludes that Plaintiff did not carry its burden of proof on the § 727(a)(3) claim.

E.      § 727(a)(4).

Section 727(a)(4) provides that the Court shall grant the debtor a discharge unless he "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  Denial of discharge under § 727(a)(4) requires a material, false oath, made knowingly, with intent to defraud.  *In re Brown,* 108 F.3d 1290, 1294 (10th Cir. 1997); *In re Calder,* 907 F.2d 953, 955 (10th Cir. 1990).

The materiality requirement is satisfied if the false oath "'bears a  relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets,  business dealings, or the existence and disposition of his property.'"  *United States Trustee v. Garland (In re Garland),* 417 B.R. 805, 814 (10th Cir. BAP 2009), quoting *Chalik v. Moorefield (In re Chalik),*

748 F.2d 616, 618 (11th Cir. 1984). Debtors have a duty to fully disclose all of their assets, without deciding for themselves what is "important enough for parties in interest to know." *Freelife International, LLC v. Butler (In re Butler),* 377 B.R. 895, 923 (Bankr. D. Utah. 2006); *In re Garland,* 417 B.R. at 815 (quoting *Butler*). The materiality requirement is not defeated by the fact that the undisclosed property has no value. *Garland*, 417 B.R. at 814. *See also Calder,* 907 F.2d at 955 (rejecting debtor's argument that the undisclosed assets were worthless).

A false oath is made "knowingly" if the debtor "deliberately and consciously" signs his or her bankruptcy schedules and statement of financial affairs "knowing that they were incomplete." *In re Retz,* 606 F.3d 1189, 1198 (9th Cir. 2010).

A "reckless indifference to the truth" can satisfy the fraudulent intent requirement of § 727(a)(4). *In re Garland,* 417 B.R. at 815; *In re Butler,* 377 B.R. at 922; *Boroff v. Tully (In re Tully),* 818 F.2d 106, 112 (1st Cir. 1987). Failure to amend schedules in a timely fashion to correct errors may constitute reckless indifference to the truth. *In re Guenther,* 333 B.R. at 768.

Fraudulent intent may be inferred from the surrounding facts and circumstances, because a debtor is unlikely to admit an intention to defraud. *Calder,* 907 F.2d at 955-56. A debtor does not "wipe clean" his fraudulent intent by amending his schedules after a creditor discovers the false oath and confronts him. *In re Sholdra,* 249 F.3d 380, 383 (5th Cir. 2001) (fraudulent intent present when debtor amended schedules only after being confronted by creditor in deposition); *cf. Brown*, 108 F.3d at 1295 (fact that debtor comes forward on its own accord is strong evidence of lack of fraudulent intent).

False oaths can include statements made in depositions or Rule 2004 examinations taken in the bankruptcy case, or in written discovery responses. *In re Butler,* 377 B.R. at 922; *In re Zhang*, 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012); *In re Bushey*, 2017 WL 1091868, at *6 (Bankr. D.N.M.);

*In re Splawn*, 376 B.R. 747, 760 (Bankr. D.N.M. 2007). A material omission may constitute a false oath. *In re Splawn*, 376 B.R. at 760.

Defendant's discharge should be denied under this section. The facts outlined and discussed above show numerous, material false oaths, which Defendant made knowingly with intent to defraud. Defendant's schedules and SOFAs were materially inaccurate when filed, and have never been adequately amended. The incomplete amendments were not timely, and in part came after LANB brought the false oaths to Defendant's attention. Defendant's deposition testimony about Dana Lamey's Schwab account was false. Defendant's response to a request for production of documents (no documents relating to transfers to his sister) was false. The schedule amendment filed in March, 2017 was false regarding the Mustang GT and the tax refunds. The sworn statements about the $130,000 or more of tax refunds have never been accurate.

From the numerous material omissions, all of which benefitted Defendant, the Court concludes that Defendant intended to defraud the trustee and other parties in interest, and/or acted with reckless indifference to the truth. As a direct result of the false oaths, Defendant pocketed $149,453 that should have been paid to creditors.

F.      § 727(a)(5).

Under § 727(a)(5), Defendant's discharge should be denied if he "has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

There is no Tenth Circuit standard for determining what constitutes a satisfactory explanation of loss of assets under § 727(a)(5). Other courts have held that such a finding is left to the sound discretion of the court. *Martinez v. Sears (In re Sears)*, 565 B.R. 184 (10th Cir. BAP 2017)*, citing Blackwell Oil Co. v. Potts (In re Potts)*, 501 B.R. 711, 726 (Bankr. D. Colo. 2013).

-13-

Some courts require corroboration of a debtor's testimony about loss or disposition of assets. *Id. See also First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986 (5th Cir. 1983) (the corroboration must be sufficient to eliminate any speculation as to what happened to the assets); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984) ("Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory.").

The Court concludes that Plaintiff did not carry its burden of proof under § 727(a)(5). The trial evidence indicates that Plaintiff was able to reconstruct Defendant's accounting records and determine how he lost all of his money between 2010 and the petition date. There is not enough evidence that Defendant cannot give a satisfactory explanation for his loss of assets.

G.     LANB's Claim.

Plaintiff seeks to establish the amount of its claim. Because Defendant's discharge will be denied, Plaintiff's claim amount is not properly before the Court.

III.     CONCLUSION

Plaintiff's §§ 523(a)(6), 727(a)(3), and 727(a)(5) claims fail, but Plaintiff carried its burden of proving that Defendant's discharge should be denied under §§ 727(a)(2)(B) and (a)(4). The Court will enter a separate final judgment consistent with this opinion.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: July 21, 2017

Copies to:

Counsel of record